

ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ) | **3-19CV-2676B** |
| LESLIE D. JENNINGS, MD, ) | |
| ) | |
| **Plaintiff,** ) | Case No. |
| **v.** ) | **FILED UNDER SEAL** |
| ) | **PURSUANT TO 31 U.S.C.** |
| ) | **§ 3730(b)(2)** |
| FLOWER MOUND HOSPITAL ) | |
| PARTNERS, LLC ) | **DO NOT PUT IN PRESS** |
| (d/b/a TEXAS PRESBYTERIAN ) | **BOX OR INTO PACER SYSTEM** |
| HOSPITAL ) | |
| FLOWER MOUND), and TEXAS ) | |
| HEALTH RESOURCES, ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

### RELATOR LESLIE D. JENNING, MD's COMPLAINT PURSUANT TO 31 U.S.C. § 3729, *et seq.* OF THE FEDERAL FALSE CLAIMS ACT

The United States of America, by and through *qui tam* relator Leslie D. Jennings, MD and

his counsel, bring this action under 31 U.S.C. § 3729 *et seq.,* as amended, to recover all damages,

penalties and other remedies established by the False Claims Act on behalf of the United States

for violations by the Defendants (*see* Part III) for knowingly and falsely obtaining and retaining

the payment of false claims by the United States in violation of the False Claims Act, 31 U.S.C.§

3729, *et seq.*, as amended by the Fraud Enforcement and Recovery Act of 2009 ("***FERA***"), 123

Stat. 1617, *et seq.*

1.     This case has four main issues associated with Defendants' unlawful acts and

knowing and intentional conduct in violation of the False Claims Act:

> a.     Flower Mound Hospital—as part of a scheme with the other Defendant and
> individuals and persons to increase the volume of referrals from its physician
> owners to Flower Mound Hospital—knowingly and intentionally violated the Anti-

Kickback Statute ("AKS") and Physician Self-Referral Law ("Stark Law") when it conditioned the physicians' ownership and retention of Class P units, and the corresponding lucrative returns, in Flower Mound Hospital, on having each physician owner maintaining an excessive number of "Patient Contacts"[1] per year;

b.    Defendant Texas Health Resources as part of a scheme with other individuals and persons to increase the volume of referrals from its physician owners to all of the THR-physician joint venture hospitals—knowingly and intentionally violated the AKS and Stark Law when it conditioned the physicians' ownership in its joint venture hospitals, including Flower Mound Hospital, and the corresponding lucrative returns, on having each physician owner maintaining an excessive number of "Patient Contacts" per year;

c.    Texas Health Resources, THR-physician joint venture hospitals and Flower Mound Hospital knowingly and intentionally violated AKS and Stark Law by knowingly failing to comply with the attestation requirements for claims submitted to the Federal Programs the between 2012 and the present, which led to the knowing and intentional submission of false claims for payment from the Federal Programs, and the knowing and intentional retention of the payments from the United States Government; and

d.    Texas Health Resources, THR-physician joint venture hospitals and Flower Mound Hospital  knowingly and intentionally exploited the Federal Programs' beneficiaries and knowingly retained money received from the federal government between 2012 and the present in order to artificially inflate revenues and defraud the United States Government.

## I.    PRELIMINARY STATEMENT

2.    "Health care laws prevent health care providers, and physicians in particular, from referring Medicare services in exchange for financial incentives [and] The Department of Justice is committed to enforcing those laws and preventing physicians from improperly injecting profit motives into their decisions about patient care."[2]

---

[1] The term "Patient Contact" is utilized in various contracts, bylaws and documents by the Defendants and has different meanings over time. "Hospital Contact" and "Physician Encounter" are also utilized by the Defendants as an equivalent term. Unless specifically stated otherwise, these three terms will be collectively referred to as "Patient Contacts."

[2] U.S. Department of Justice, *Two California Urologists Agree to Pay More than $1 Million to Settle False Claims Act Allegations Related to Radiation Therapy Referrals* (Jan. 23, 2018), https://www.justice.gov/opa/pr/two-california-urologists-agree-pay-more-1-million-settle-false-claims-act-allegations.

3.      Tragically, there are daily attempts by unscrupulous individuals and corporations to divert taxpayer dollars from Federal Programs like Medicare for their own gain and away from their intended goal—to provide medical care and save lives. The Center for Medicare and Medicaid Services ("*CMS*") estimated in 2014 some $60 billion of American taxpayer money, or more than 10 percent of Medicare's total budget, was lost to fraud, waste, abuse and improper payments.[3] This case involves such schemes.

4.      In this case, the Defendants deployed a fraudulent scheme which conditioned the physician ownership of Class P membership units in Flower Mound Hospital Partners, LLC (a/k/a Flower Mound Hospital),[4] on the requirement that investing physicians have twenty-four (24) Patient Contacts in one (1) year – a number that is an outlier not only in Dallas-Fort Worth Metroplex, but in other areas of Texas and the United States as well. The overall goal of the Defendants was to create a system where hospital ownership was based on the volume and value its physician investors could contribute, thereby increasing revenues exponentially. To carry out this plan, Defendants' scheme required that they file false and fraudulent claims (and knowingly retain those claims), including engaging in underlying violations of the Stark and AKS laws in order to obtain greater returns on the investment shares.

## II.   **JURISDICTION AND VENUE**

---

[3] Jim Avila, Serena Marshall and Gitika Gaul, *Medicare Funds Totaling $60 Billion Improperly Paid, Report Finds*, (ABC News television broadcast, July 23, 2015), found at https://abcnews.go.com/Politics/medicare-funds-totaling-60-billion-improperly-paid-report/story?id=32604330 (last viewed Oct. 23, 2019).

[4] Per the January 16, 2008 Company Agreement of Flower Mound Hospital Partners, LLC ("Company Agreement"), *"Class P Member* means any Qualified Physician Investor who purchases Class P Units and executes this Agreement as a Member and is admitted into the Company as a Member, but such term does not include any person who has ceased to be a Member of the Company." Although "Units" is the correct nomenclature for Limited Liability Company equity, the term "shares" appear throughout this Pleading is considered to be synonymous with "Units".

5.     This Court has subject matter jurisdiction over these claims brought under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, pursuant to 31 U.S.C. §§ 3730 and 3732 ("False Claims Act"). This Court has supplemental jurisdiction to entertain potential common law causes of action, such as unjust enrichment under 28 U.S.C. §§ 1345 and 1367(a).

6.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732(a) because that section of the False Claims Act authorizes nationwide service of process, and because the Defendants engage in interstate commerce through providing medical services to Medicare beneficiaries and other Federal Programs[5] participants throughout the Dallas-Fort Worth Metroplex, including a significant portion from Dallas, Texas and the surrounding areas.

7.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) and under 28 U.S.C. §§ 1391(b) and 1395(a), because the Defendants transact business in the Northern District of Texas.

8.     There have been no public disclosures of the allegations and transactions contained herein that bar jurisdiction under 31 U.S.C. § 3730.

9.     Relator is unaware of any public disclosures.  To the extent there has been such a public disclosure of any of Relator's allegations herein, he is an original source of those allegations within the meaning of 31 U.S.C. § 3730(e)(4)(B). Relator possesses direct and independent knowledge of the information on which the allegations are based. Relator also voluntarily disclosed to the United States Government this information prior to the filing of this complaint. *See* 31 U.S.C. § 3730(e)(4)(B).

10.     Pursuant to 31 U.S.C. § 3730(b)(2), this action is being filed under seal, and has not been served on the Defendants. Relator has provided the United States Attorney General and

---

[5] "***Federal Programs***" as used herein is to mean Medicare, Medicare Advantage, Medicaid, TRICARE, CHAMPVA.

the United States Attorney for the Northern District of Texas with a copy of this Complaint and a disclosure statement, which was separately submitted and contains all material evidence in support of this Complaint.

### III.   PARTIES

11.     This case involves a sole Relator, Dr. Leslie D. Jennings and multiple Defendants. Dr. Jennings is an accomplished physician, who has extensive first-hand knowledge about the Defendants' fraudulent acts.

### A.     The Relator and the Government Plaintiff

#### (1) *The Relator*

12.     Relator **Leslie D. Jennings, MD** ("***Dr. Jennings***" or "***Relator***") is sui juris and is a citizen of Dallas County, Texas. Dr. Jennings obtained his bachelor's degree from the University of Texas at Austin and subsequently earned his medical degree from the University of Texas Health Science Center at Houston. In 1986, he completed a residency in orthopedic surgery at Louisiana State University in New Orleans, Louisiana. Following his residency, Dr. Jennings was selected for the prestigious fellowship in sports medicine and knee surgery at the Southern California Center for Sports Medicine in Los Angeles, California. Since 1992, Dr. Jennings has been board certified in orthopedic surgery and in 2008, he obtained his specialty board certification in sports medicine.[6]

13.     Dr. Jennings has been affiliated with, and had an ownership interest in, Flower Mound Hospital from its inception in 2007. At the time Dr. Jennings purchased his shares, it was for fair market value and was a transaction that he believed complied with relevant physician

---

[6] *See* http://www.txkneeandsports.com/physician/dr-ld-jennings-md-carrollton-tx-75010.php (last visited Oct. 21, 2019).

ownership and anti-kickback laws. In fact, the Flower Mound Hospital Company Agreement expressly stated in Article 13, Section 13.2 that "[w]ithout limiting the generality of the foregoing, the Company and the Hospital have been structured in a manner to comply with the intent of the ambulatory safe harbor provisions set forth in 42 C.F.R. §1001.952(i)(4)." Section 13.3 expanded upon Section 13.2 stating that "[n]othing contained in this Agreement shall require (directly or indirectly, explicitly or implicitly) any Member to refer or direct any patients or other business to the Company or the Hospital."

14.     Despite these representations, beginning in 2012 with the change in Flower Mound Hospital leadership and THR ownership, Dr. Jennings noticed a pronounced emphasis on the volume of referrals. Dr. Jennings personally witnessed hospital executives narrow the definition of Patient Contact to expressly mean surgical procedures (thereby increasing revenue derived from Patient Contacts), as well as forcing physicians who were not considered to have "high volume" Patient Contacts to "sell" their shares back to the hospital so those shares could be redistributed to other, high-volume physicians. Dr. Jennings witnessed and tried to curtail the Defendants' actions of changing the hospital's policies, procedures, and bylaws to condition ownership on the volume of cases physician-owners had, and the monetary value they could bring to the hospital.  In direct response, Flower Mound Hospital's administration, counsel and certain high-volume physicians deemed Dr. Jennings "disruptive" and retaliated against him by "clawing back" his shares.

### (2) *The Government Plaintiff*

15.     The United States Government is a Plaintiff for which recovery is sought for damages on behalf of the Department of Health and Human Services ("***HHS***") and other relevant Federal Programs.

### B.     The Defendants

16.     Defendant **Flower Mound Hospital Partners, LLC** (d/b/a Texas Health Presbyterian Hospital Flower Mound) ("***Flower Mound Hospital***") is a Texas Limited Liability Company with its address at 4400 Long Prairie Road, Flower Mound, Texas 75028 and its registered agent, Andrew N. Meyercord, located at 1601 Elm Street, Suite 4600, Dallas, Texas 75201. Flower Mound Hospital is co-owned by Texas Health Resources, a non-profit corporation, the parent company for the well-known Texas Health Resources medical network, which owns 53.67%, and a group of physician investors who own the collective 46.33%.

17.     Defendant **Texas Health Resources** (**"*THR*"**) is a Texas non-profit corporation, which was initially formed on April 1, 1997 as HMP Health Resources. Its corporate headquarters is located at 612 E. Lamar Blvd., Suite 1400, Dallas, Texas 75201. THR is Flower Mound Hospital's parent company and owns Class H Units totaling 53.67%.[7] THR has a similar physician joint-ownership structure with Texas Health Harris Methodist Hospital Southlake, Texas Health Center for Diagnostics & Surgery Plano, Texas Health Presbyterian Hospital Rockwall and TISS-Presbyterian Walnut Hill.

18.     According to its website, "Texas Health Resources is one of the largest faith-based, nonprofit health systems in the United States. The health system includes 25 acute-care and short-stay hospitals that are owned, operated, joint-ventured or affiliated with Texas Health Resources. It includes the Texas Health Presbyterian, Texas Health Arlington Memorial and Texas Health Harris Methodist hospitals, Huguley Memorial Medical Center, Texas Health Physicians Group,

---

[7] Texas Health Presbyterian Hospital Dallas d/b/a Texas Health Presbyterian, Texas Health Dallas and Texas Health Presbyterian Hospital is a Texas non-profit corporation formed on July 21, 1958 as Presbyterian Hospital of Dallas. Its registered agent is Donald B. Collins, 612 E. Lamar Blvd., Arlington, TX 76011.

outpatient facilities, behavioral health and home health, preventive and fitness services, and an organization for medical research and education."[8]

## IV.   APPLICABLE LAW

19.   According to the Office of the Inspector General, U.S. Department of Health and Human Services, "[t]he five most important Federal fraud and abuse laws that apply to physicians are the False Claims Act (FCA), the Anti-Kickback Statute (AKS), the Physician Self-Referral Law (Stark law), the Exclusion Authorities, and the Civil Monetary Penalties (CMPL)."[9] At least three of these fundamental fraud and abuse laws are at issue here.

### A.   The False Claims Act

20.   The False Claims Act prohibits false and/or fraudulent claims to government programs. A person or entity violates the False Claims Act when, among other things, that person or entity: (1) knowingly presents or causes to be presented to the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; or (3) conspires to defraud the United States Government by getting a false or fraudulent claim allowed or paid. The False Claims Act attaches liability not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment.

21.   Four provisions of the False Claims Act are at issue in this case:

    a.   Section 3729(a)(1)(A) creates liability for "any person who ... knowingly presents, or causes to be presented, false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

    b.   Section 3729(a)(1)(B) creates liability for "any person who ... knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or

---

[8] *See* https://www.texashealth.org/news/texas-health-resources-merges-foundations-to-advance-regional-philanthropy-and-stewardship (last visited Oct. 22, 2019).
[9]   HHS-OIG, *A Roadmap for New Physicians Fraud & Abuse Laws*, https://oig.hhs.gov/compliance/physician-education/01laws.asp (last visited Aug. 14, 2019).

fraudulent claim." *Id.* § 3729(a)(1)(B).

    c.   Section 3729(a)(1)(C) creates liability for those who "conspire[] to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)"; and

    d.   Section 3729(a)(1)(G), known as the "reverse false claims" provision, creates liability for "any person who … knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly avoids or improperly avoids or decreases an obligation to … the Government." *Id.* § 3729(a)(1)(G). *See also United States ex rel. Capshaw v. White*, 2018 WL 6068806; *United States of America ex rel. Chris Riedel v. Boston Heart Diagnostics Corporation*, Case No. 12-1423 (RBW), Doc. 48 (D.D.C. 2018).

    22.    As the False Claims Act's legislative history illustrates, "[c]laims may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate in the program."[10] There are three broad categories of false claims: (1) factually false; (2) legally false; and (3) reverse false claim. *Kane v. Healthfirst, Inc.*, 2015 WL 4619698 (S.D.N.Y. Aug. 3, 2015) (highlighting the sixty-day rule, 81 Fed Reg. 7653 (Feb. 12, 2016), and the False Claims Act reverse false claim doctrine, 31 U.S.C. 3729(a)(1)(G)). A factually false claim is defined as an "incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001).

    23.    By way of contrast, legally false claims are predicated on an express or implied false certification of compliance with a regulation, statute or contract term. This category is more complicated and has resulted in one of the most controversial debates on the proper scope of False Claims Act liability. Express false claim cases have been accepted by District Courts without controversy. In *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016) (hereinafter "*Escobar*"), the United States Supreme Court resolved a split in the Circuit

---

[10] S. REP. No. 345, 99th Cong., 2d Sess. 9 (1986), *reprinted in* 1986, U.S.C.A.A.N. 5266, 5274.

Courts as to whether an implied false certification claim was permissible. The Court held that the "implied" certification theory constitutes a viable basis for a cause of action under the False Claims Act. The caveat – "that any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Id* at 1995.

24.     Compliance with relevant regulations is material to the government's decision to pay claims for medical services. "In general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed.'" *Neder v. United States*, 527 U.S. 1, 16 (1999) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995); cited by *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 1999 (2016)).

25.     In *United States of America ex rel. Capshaw v. Bryan L. White, M.D. and Suresh G. Kuman, R.N.*, 2018 WL 6068806, at *4 (N.D. Tex. Nov. 20, 2018), the United States District Court for the Northern District of Texas (Dallas Division) opined that "AKS violations are not 'garden variety breaches of contract or regulatory violations' that the Supreme Court sought to shield from the wrath of the FCA. *Escobar*, 136 S. Ct. at 2003. They are serious, consequential, felony transgressions of law that the Government actively enforces. Every indication is that this is precisely the kind of violation the FCA is supposed to reach." *Id.; see also, United States v. Berkeley Heartlab, Inc.*, 2017 WL 6015574, at *2 (D.S.C. Dec. 4, 2017) (holding "AKS compliance is material to payment decisions in all cases."). These two cases are representative that the United States Government considers claims that are similar to this matter to be material.

26.     In *United States ex rel. Hale v. Rotech Healthcare Inc.*, Rotech Healthcare, Inc. ("Rotech") admitted it had "engaged in a systematic scheme to defraud the United States and the

Plaintiff-States by fraudulently billing government-funded health care programs for respiratory equipment and services that were medically unnecessary, never provided, and/or otherwise billed in violation of the rules of Medicare, Medicaid and other government-funded health care programs." First Amended Complaint ¶ 2, *United States ex rel. Hale v. Rotech Healthcare Inc.*, No. 4:14-cv-545 (E.D. Tex. Apr. 22, 2015), ECF No. 8. Rotech's actions were deemed material. Here, the individual Defendants' specific actions, directives, oversight and control are evidence that Defendants knew of and approved of the fraudulent activities alleged herein and that their actions are similar to those that have been deemed material. *United States ex rel. Hebert v. Dizney*, 295 F. App'x 717, 722 (5th Cir. 2008).

27.     To show that a person or entity acted "knowingly" under the False Claims Act, it must be proven that, with respect to information, the person or entity (1) had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the information. It is not necessary to prove that the person or entity had the specific intent to defraud the United States Government. 31 U.S.C. § 3729(b)(l).

28.     Under the False Claims Act, the United States Government is entitled to recover three times the amount of damages which it sustained because of the false claims in addition to and a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 for each violation of the statute that occurred prior to November 2, 2015 and not less than $11,181 and not more than $22,363 for violations that occurred after November 2, 2015. The current civil monetary penalties inflation rule was published in the Federal Register on April 5, 2019 and states that "there is no need for any revisions to the

adjusted civil penalty amounts that are applicable for penalties assessed in 2016, 2017 or 2018."[11]

29.     There are two main laws that address kickbacks to providers – the Anti-Kickback Statute and Stark Law, as defined below. Although similar in many ways, including that both support the basis for liability under the False Claims Act if done knowingly, these two laws differ drastically on an important item – intent.

**B.     Stark Law**

30.     The Stark Law was enacted to address overutilization of services by physicians who stood to profit from referring patients to facilities or entities in which they had a financial interest The Stark Law, and regulations promulgated pursuant thereto ("***Stark Regulations***") prohibits:

        a.   a physician who has a "financial relationship" with an entity—such as a hospital— from making a "referral" to that hospital for the furnishing of certain "designated health services" for which payment otherwise may be made by the United States Government under the Medicare program. 42 U.S.C. § 1395nn(a)(1); 42 C.F.R. § 411.353(a);

        b.   a hospital from submitting for payment a Medicare claim for services rendered pursuant to a prohibited referral. 42 U.S.C. § 1395nn(a)(1)(B); 42 C.F.R. § 411.353(b); and

        c.   the United States Government from making payments pursuant to such a claim and requires hospitals to reimburse any payments that are mistakenly made by the United States Government. 42 U.S.C. § 1395nn(g)(1); 42 C.F.R. § 411.353(c), (d).

However, when a physician initiates a service and personally performs it, that action does not constitute a referral under the Stark Law. 42 U.S.C. § 1395nn(h)(5); 42 C.F.R. § 411.351.

31.     The Stark Law and Stark Regulations define a "financial relationship" to include "a compensation arrangement" in which "remuneration" is paid by a hospital to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §§

---

[11] 84 Fed. Reg. 13520 (Apr. 5, 2019),
https://www.federalregister.gov/documents/2019/04/05/2019-06732/civil-monetary-penalties-inflation-adjustment.

1395nn(a)(2), (h)(1); 42 C.F.R. § 411.354. An indirect financial relationship exists if, *inter alia*, there is an indirect compensation arrangement between the referring physician and an entity that furnishes services.

32.    An indirect compensation arrangement exists if, *inter alia*, the referring physician receives aggregate compensation that "varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing" services. 42 C.F.R. § 411.354(c)(2)(ii).

33.    The Stark Regulations provide that certain enumerated compensation arrangements do not constitute a "financial relationship." 42 C.F.R. § 411.357. Significantly for our purposes, a subset of indirect compensation arrangements do not constitute a financial relationship if the compensation received by the referring physician is (1) not equal to the "fair market value for services and items actually provided";[12] (2) *"not determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician"* for the hospital; and (3) "commercially reasonable."[13] 42 C.F.R. § 411.357(p)(emphasis added).

---

[12] The Stark Regulations define "fair market value" as: [T]he value in arm's-length transactions, consistent with the general market value. "General market value" means the price that an asset would bring as the result of bona fide bargaining between well-informed buyers and sellers who are not otherwise in a position to generate business for the other party, or the compensation that would be included in a service agreement as the result of bona fide bargaining between well-informed parties to the agreement who are not otherwise in a position to generate business for the other party, on the date of acquisition of the asset or at the time of the service agreement. Usually, the fair market price is . . . the compensation that has been included in bona fide service agreements with comparable terms at the time of the agreement, . . . [and] has not been determined in any manner that takes into account the volume or value of anticipated or actual referrals. 42 C.F.R. § 411.351.

[13] A "commercially reasonable" arrangement is one that "would make commercial sense if entered into by a reasonable entity of similar type and size and a reasonable physician . . . of similar scope and specialty, even if there were no potential [service] referrals" pursuant to the arrangement. 69 Fed. Reg. at 16,093.

Subsection 411.357(p) is known as the "indirect compensation arrangements exception." *See, e.g.*, 72 Fed. Reg. at 51,014.

**C.      Anti-Kickback Statute**

34.      The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b (the "***AKS***"), expressly prohibits any individual or entity from offering, paying, soliciting, or receiving any "remuneration," which includes "any kickback, bribe, or rebate," to "any person to induce such person" to purchase or recommend a product or service that is covered by Medicare or Medicaid.

35.      The AKS and analogous state laws make it illegal for individuals or entities to knowingly and willfully "offer[] or pay[] remuneration (including any kickback, bribe, or rebate) . . . to any person to induce such person . . . to purchase . . . , order . . . , or recommend purchasing . . . or ordering any good . . . or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). Payments by a person to medical providers to induce them to utilize facilities, products and/or services that are ultimately paid for by federal and state health care programs are examples of such illegal remuneration.

36.      First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

37.      As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, § 6402(f), 124 Stat. 119, codified at 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]."

38.     According to the legislative history of the PPACA, this amendment to the AKS was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act, even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10854.

39.     Compliance with the AKS, 42 U.S.C. § 1320a-7b(b), is a condition of payment under the federal health care programs. Claims for products and services arising from kickbacks expressly and implied misrepresent compliance with a material condition of payment, to wit, compliance with the AKS.

40.     The AKS has been interpreted by the United States Court of Appeals for the Fifth Circuit to cover any arrangement where "one purpose" of the remuneration is to obtain money for the referral of services or to induce further referrals. *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998).

41.     HHS has published safe harbor regulations that define practices that are not subject to prosecution or sanctions under the AKS because such practices would be unlikely to result in fraud or abuse. *See* 42 C.F.R. § 1001.952. Only those arrangements, however, that precisely meet all of the conditions set forth in the safe harbor regulations are afforded protection. None of the practices at issue in this case meet these safe harbor regulations.

42.     To show that a person or entity acted "knowingly" under the False Claims Act, it must be proven that, with respect to information, the person or entity (1) had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the information. It is not necessary to prove that the person or entity had the specific intent to defraud the United States. 31 U.S.C. § 3729(b)(l).

43.     The AKS has been interpreted by the United States Court of Appeals for the Third

Circuit to cover any arrangement where "one purpose" of the remuneration is to obtain money in exchange for the utilization of goods or services or to induce further utilization of goods, services or referrals. *United States v. Gerber*, 760 F.2d 68 (3rd Cir. 1985). Most federal circuit courts have adopted the "one purpose" test first enumerated in the *Greber* case. Thus, if one purpose of the payment was made to incentivize the physician to refer patients, then the AKS has been violated.

44.     In 1996, the AKS was further amended through the Health Insurance Portability and Accountability Act ("*HIPAA*"), Pub. L. 104-191 (Aug. 1996). Three material changes were made to the AKS by HIPAA: (1) extended the statute to apply to services covered by the "federal health care programs"; (2) adding a new safe harbor concerning certain risk-sharing arrangement; (3) enhancing communication between the Office of Inspector General ("*OIG*") and the public.

45.     The PPACA, § 10606(b) sets forth that a person "need not have actual knowledge of this section or specific intent to commit a violation of this Section." Thus, ignorance is no longer bliss. Additionally, PPACA, Section 6001(a)(1)(i)(C) amended the "Whole Hospital" investment exception to expressly require the following conditions precedent in order to avoid conflicts of interest:

(C) PREVENTING CONFLICTS OF INTEREST.

…

(ii) The hospital has procedures in place to require that any referring physician owner or investor discloses to the patient being referred, by a time that permits the patient to make a meaningful decision regarding the receipt of care, as determined by the Secretary—

(I) the ownership or investment interest, as applicable, of such referring physician in the hospital; and

(II) if applicable, any such ownership or investment interest of the treating physician.

(iii) *The hospital does not condition any physician ownership or investment interests either directly or indirectly on the physician owner or investor making or*

Page 16

*influencing referrals to the hospital or otherwise generating business for the hospital.*[14] (emphasis added).

46.     Flower Mound Hospital is a hospital jointly owned by THR and various physicians, which THR describe as "joint ventures". Flower Mound Hospital is one of several such joint ventures. Flower Mound Hospital and other THR joint-venture hospitals such as Texas Health Harris Methodist Hospital Southlake's websites indicate that "[s]ome physicians have an ownership interest in the hospital."[15][16] Similarly, Texas Health Hospital Rockwall's website states: "Texas Health Hospital Rockwall is a joint venture owned by Texas Health Resources and physicians dedicated to the community, and meets the definition under federal law of a physician-owned hospital"[17]; and Texas Health Center for Diagnostics & Surgery Plano, a THR joint-venture hospital, states: "a joint venture owned by Texas Health Resources and physicians dedicated to the community and meets the definition under federal law of a physician owned hospital."[18] Although THR discloses that physicians have an ownership interest in various hospitals, THR does not disclose that any of these hospitals (including Flower Mound Hospital) condition physician ownership on making or influencing referrals.

## V.     GOVERNMENT HEALTH CARE PROGRAMS

47.     According to its website, THR (and its joint-venture hospitals) accept a variety of insurance plans, including but not limited to the following: Medicare, Medicare Advantage,

---

[14] *See* https://www.cms.gov/Medicare/Fraud-and-Abuse/PhysicianSelfReferral/Downloads/Section_6001_of_the_ACA.pdf (last visited Oct. 21, 2019).

[15] *See* https://www.texashealthsouthlake.com (last visited Oct. 21, 2019).

[16] *See* https://www.texashealthflowermound.com (last visited Oct. 21, 2019).

[17] *See* https://www.texashealthrockwall.com (last visited Oct. 21, 2019).

[18] *See* https://www.thcds.com (last visited Oct. 21, 2019).

Medicaid and TRICARE, as well as private payers.[19]

A.     **Medicare**

48.     In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program (*"Medicare"*) to provide health insurance for the elderly and disabled. Medicare is a health insurance program for people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

49.     Medicare now has four parts: Part A; Part B; Part C; and the Part D Program.

50.     Medicare Part A (hospital insurance) helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care). Medicare Part A also helps cover hospice care and some home health care.

51.     Medicare Part B (medical insurance) helps cover doctors' services and outpatient care, as well as other medical services not covered by Part A.  Part B also helps pay for covered health services and supplies when they are medically necessary.

52.     Medicare Part C (supplemental insurance) enables Medicare beneficiaries to purchase Medicare approved plans through private insurance companies. Known as Medicare Advantage plans, an eligible individual must first enroll in Part A and Part B.

53.     Medicare Part D (prescription drug plan) provides beneficiaries with assistance in paying for out-patient prescription drugs.

54.     The Medicare Program is administered through CMS, an agency of HHS.  Much of the daily administration and operation of the Medicare Program is managed through private

---

[19]*See* https://www.texashealth.org/patient-and-visitor-information/billing-and-payment-information/health-insurances-accepted (last visited Oct. 21, 2019).

insurers under contract with the federal government.

55.     Medicare reimburses only reasonable and necessary medical products and services furnished to Medicare beneficiaries and excludes from payment services that are not reasonable and necessary. 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.115(k). Providers must also assure that they provide medical services to Medicare recipients "economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1).

56.     Under Medicare Part A, contractors serve as "fiscal intermediaries," administering Medicare in accordance with rules developed by CMS.

57.     Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers," are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

58.     Under Medicare Part C, Medicare pays a fixed amount to companies offering the Medicare Advantage Plans for beneficiaries' care. The companies that offer these Part C plans are required to abide by the Medicare Rules. The out-of-pocket costs can vary between each Medicare Advantage Plan, which may include services and/or supplies.

59.     Under Medicare Part D, Medicare beneficiaries must affirmatively enroll in one of many hundreds of Part D plans ("***Part D Sponsors***") offered by private companies that contract with the federal government. Part D Sponsors are charged with and responsible for accepting Medicare Part D claims, determining coverage, and making payments from the Medicare Trust Fund.

60.     The principal function of both intermediaries and carriers is to make payments for

Medicare services, and to audit claims for those services, to assure that federal funds are spent properly. CMS contracts out to Medicare Administrative Contractors ("*MAC*"), also known as carriers, to review, approve, and pay Medicare claims received from healthcare providers like Defendants. Given that it is not either realistic or feasible for MACs to review medical documentation before paying each claim, payment is generally made under Medicare based on the providers' certification on the Medicare claim form that services in questions were "medically indicated and necessary for the health of the patient."

61.     To participate in Medicare, providers must assure that their services are provided economically are medically necessary. Medicare will only reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific illness or injury.

**B.     Medicaid**

62.     Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act ("*Medicaid*"). The Medicaid program aids the states in furnishing medical assistance to eligible needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

63.     Medicaid is a cooperative federal-state public assistance program that is administered by the states. Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program. Federal support for Medicaid is significant.

64.     Title XIX of the Social Security Act allows considerable flexibility within the states' Medicaid plans and therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

65.     However, to receive federal matching funds, a state Medicaid program must meet

certain minimum coverage and eligibility standards.  A state must provide Medicaid coverage to needy individuals and families in five broad groups: (1) pregnant women; (2) children and teenagers; (3) seniors; (4) people with disabilities; and (5) people who are blind.  In addition, the state Medicaid program must provide medical assistance for certain basic services, including inpatient and outpatient hospital services.

**C.**    **TRICARE**

66.    TRICARE is a health care program for individuals and dependents affiliated with the armed forces. It is administered by the United States Department of Defense ("***DOD***"). TRICARE also contracts with fiscal intermediaries and managed care contractors to review and pay claims.

**D.**    **CHAMPVA**

67.    CHAMPVA is a healthcare program for veterans and dependents. It is administered by the United States Department of Veteran's Affairs ("***VA***"). CHAMPVA also is a comprehensive health care benefits program in which the VA shares the cost of covered health care services and supplies with eligible beneficiaries.

**E.**    **Federal Employee Health Benefits Program**

68.    The Federal Employee Health Benefits Program is administered by the Office of Personnel Management. It is a system whereby employee health benefits are provided to civilian government employees and annuitants of the United States Government.

**VI.    DEFENDANTS CONSPIRE TO CREATE AND IMPLEMENT A MINIMUM CONTACTS REQUIREMENT TO INDUCE REFERRALS IN VIOLATION OF AKS AND STARK LAW**

**A.**    **The Patient Contacts Requirement is Intended to Induce Referrals.**

69.    Generally, Flower Mound Hospital violated the False Claims Act by knowingly and intentionally engaging in the following fraudulent and unlawful conduct: (1) implementing,

through its Bylaws and Company Agreement, an excessive number of Patient Contacts per year as a requirement for ownership of Class P units; (2) creating a merit based referral system for ownership, where high producing physicians were offered ownership in Flower Mound Hospital based on their production; (3) implementing a fraudulent billing and claims submission scheme which failed to disclose the hospital's condition of ownership on referrals; and (4) retaining payments from the fraudulent claims.

70.     Flower Mound Hospital maintains a policy against the violation of Stark Regulations and AKS. Initially, the Flower Mound Hospital's *Administrative Policies and Procedures Healthcare Compliance Plan* (May 1, 2009), included express provisions against violating Stark Regulations and AKS Laws. Section 4.a. stated:

> "[t]he Hospital shall not pay physicians for referrals. The Hospital accepts patient referrals and admissions based solely on the patient's medical needs and the Hospital's ability to render the needed services. The Hospital shall not pay or offer to pay any physician or in any way condition payments to a physician upon the referral of patients to the hospital."

71.     Then, in an August 22, 2011 letter from Dr. Michael S. Hisey, Chairman of Flower Mound Hospital's Board of Managers ("Dr. Hisey") to Class P unit holders, he proposed amending the Company Agreement because of Flower Mound Hospital's financial instability and THR's willingness to enter into a joint venture. Dr. Hisey acknowledges one facet of the Stark Regulations – fair market value, stating:

> "Because the hospital is, in part, physician owned, Stark laws would require that this cost be at fair market value, which turns out to be a certain number of basis points. Beyond that, if THR were to provide the additional security and if the hospital were to default on the loan, THR would be on the line for the entire value of the loan. They would be, in essence, paying the $17,000 per unit that was financed by all of the investors. This would be a payment to physicians, and therefore be a Stark violation. To keep in compliance, they need to retain the option to purchase the Class P Units in the event of a default. The current Company Agreement does not allow for such an occurrence and so the need for an amendment."

72.     Apparently, the concept of inducing referral patients based on volume or value, either in cash or in-kind, directly or indirectly, was overlooked by Dr. Hisey and other high-volume physicians, who also hold the largest percentage of Class P Units. Eventually they co-conspired with Spencer Turner ("***Turner***"), who became President of Flower Mound Hospital in 2012, to orchestrate a myriad of changes in the Medical Staff Bylaws and the Company Agreement in order to increase the volume of referrals to Flower Mound Hospital.

**(1) Flower Mound Hospital Increases the Required Number of "Patient Contacts" to Maximize Referrals.**

**i.     THR Hospital Structures & Ownership**

73.     THR has two ownership structures for its acute care hospitals: (1) joint-ventures with physicians (*i.e.* for Flower Mound Hospital, 53.7% THR; 46.33% physicians); and (2) corporate-owned, (100%) THR. A list of the THR-physician joint venture hospitals is included in Table A.

| |
|---|
| Flower Mound Hospital[20] |
| Texas Health Harris Methodist Hospital Southlake |
| Texas Health Center for Diagnostics & Surgery Plano |
| TISS – Presbyterian Walnut Hill |
| Texas Health Presbyterian Hospital Rockwall |

(collectively the "***THR-Physician Joint Venture Hospitals***").

---

[20] Ownership percentages vary depending on the source. The THP Flower Mound Operating Agreement initially stated THR (53%) and physician owners (47%).

74.     THR also has twenty-one (21) hospitals that are solely owned by THR. A list of the THR corporate owned hospitals is included in Table B, below.

| TABLE B |
| --- |
| Texas Health Allen |
| Texas Health Alliance |
| Texas Health Arlington Memorial |
| Texas Health Azle |
| Texas Health Burleson |
| Texas Health Cityline |
| Texas Health Clearfork |
| Texas Health Cleburne |
| Texas Health Dallas |
| Texas Health Denton |
| Texas Health Fort Worth |
| Texas Health Heart & Vascular |
| Texas Health HEB |
| Texas Health Huguley |
| Texas Health Kaufman |
| Texas Health Plano |
| Texas Health Prosper |
| Texas Health SW Fort Worth |
| Texas Health Specialty Hospital |

| Texas Health Stephenville |
| Texas Health Willow Park |

(collectively the "***THR Corporate Hospitals***").

> ii.  **Patient Contacts Required at THR Physician Joint Venture Hospitals Differ from the Requirements at THR Corporate Hospitals and Non-THR Hospitals in Dallas, Fort-Worth Area**

75.     For years, physician ownership in acute care hospitals fell under the "whole hospital" safe harbor. However, in 2010, Section 6001 of the PPACA curtailed physician ownership in hospitals, although certain hospitals that had physician owners were grandfathered in, provided that certain protections, including safeguards against conflict of interests were met. Specifically, "[t]he hospital does not condition any physician ownership or investment interests either directly or indirectly on the physician owner or investor making or influencing referrals to the hospital or otherwise generating business for the hospital."[21]

76.     Nevertheless, THR conditioned its physicians' ownership interest in Flower Mound Hospital on the physicians' volume of cases and the number of Patient Contacts. Specifically, Flower Mount Hospital requires their physicians to have twenty-four (24) Patient Contacts per year to maintain "active medical staff" status,[22] which is mandatory in order to purchase and retain ownership interest in Flower Mound Hospital. Upon information and belief, THR operates under a similar or identical structure for the other THR-Physician Joint Venture Hospitals.

---

[21] *See* https://www.cms.gov/Medicare/Fraud-and-Abuse/PhysicianSelfReferral/Downloads/Section_6001_of_the_ACA.pdf (last visited Oct. 21, 2019).
[22] The active medical staff requirement is defined differently throughout Flower Mound Hospital's history. For instance, in the 2012 Medical Staff Bylaws for Flower Mound Hospital, the active medical staff category is simply referred to as "Active Staff." However, in February of 2016, a letter was sent to Dr. Jennings stating that this category had been redefined as "Active-Attending Staff."

77.     This change is significantly higher than the number of Patient Contacts required by the THR Corporate Hospitals (twelve (12) Patient Contacts per year), other hospitals in the Dallas-Fort Worth Metroplex (ranging from six (6) to twelve (12) Patient Contacts per year) and nationwide (ranging from zero (0) to twelve (12)). In fact, the twenty-four (24) Patient Contact requirement is an outlier in the Dallas-Fort Worth community and across the country. Table C sets forth the minimum number of patient contacts for comparable hospitals and hospital systems.

| | |
|---|---|
| Baylor Scott & White Medical Center Carrollton (Carrollton, Texas) | "[A] minimum of twelve (12) or more patient contacts per appointment." Exceptions may be made in certain circumstances when a member has six (6) or fewer contacts. NOTE: an appointment is for two (2) years. |
| Baylor Scott & White Hospital – Round Rock (2015) (Round Rock, Texas) | Twenty-four (24) patient contacts per *two-year* reappointment period. |
| HCA Medical City Dallas Hospital (Dallas, Texas) | Six (6) patient contacts per year. |
| Medical Center of Lewisville (Lewisville, Texas) | Twenty-four (24) patient contacts per *two-year* appointment period. |
| Vanderbilt University Medical Center (Nashville, Tennessee) | No designated minimum number of patient contacts. |
| Baylor University Medical Center (2015) (Houston, Texas) | Twelve (12) patient contacts per year for active staff privileges. |
| Texas Health Plano (Plano, Texas) NOTE: THR corporate-owned hospital. | Twenty-four (24) patient contacts per *two-year* reappointment period. |

78.     While the physician ownership interests of the hospitals in Table C vary, those hospitals require a lower number of Patient Contacts per year to maintain active medical staff status, and some do not require that the contact occur at that specific hospital (instead accepting contacts from an entire health system). In addition, some hospitals even provide alternatives for physicians who do not meet such requirements but who contribute to overall patient care improvements through serving on committees.

79.     For example, using *Baylor Scott & White Medical Center Carrollton's Bylaws* as

an illustration, two items are of particular note – the definitions of "Contact" and "Active-Clinical Staff":

> ***Contact*** means a ***Practitioner-to-patient encounter, or a consultant-to-Practitioner encounter***, from which a meaningful evaluation of the Practitioner's clinical experience, competence, and care of the patient can be made. The contact must occur in the Hospital, or the Practitioner shall have the burden to present sufficient evidence of a contact that occurred in another clinical setting. For Anesthesia and Emergency Department members, determination of the number of contacts may include contacts at any Baylor Scott and White Hospital. This definition applies to any category of the Medical Staff that requires any number of contacts, unless otherwise defined in applicable privilege cards. (emphasis added).

> **§2.9.1(a) Active-Clinical Staff.** A member of the Medical Staff is eligible for the category of Active-Clinical staff by maintaining a ***minimum of twelve (12)*** or more patient contacts per appointment. In the event a member up for reappointment to the Active-Clinical Staff category has ***six (6) or fewer contacts*** during the preceding appointment period, such member shall be eligible for the Active-Clinical category if the member had significant involvement, as determined by the MEC in its sole discretion, in issues of quality of care either through Medical Staff, department, or division leadership or Medical Staff committee involvement. (emphasis added).

80.     Similarly, the Medical Staff Bylaws Manual (2019) for Texas Presbyterian Hospital of Plano (one of THR's corporate-owned hospitals) provides a broader definition of "patient contact" and only requires twenty-four (24) such contacts over two years to maintain "active medical staff" status:

> **PATIENT CONTACT** means the ***admission and/or having primary responsibility for a Patient admitted*** as an inpatient or outpatient to the Hospital, ***or the performance of*** a diagnostic service or clinical procedure on a Patient admitted to the Hospital ***at the request of the Practitioner who admitted or has primary responsibility for the Patient. Consultation*** for the purpose of evaluating or providing an opinion on the Patient's condition where a Patient visit is conducted and/or a report is dictated by the consulting Practitioner and included in the medical record ***shall also constitute*** a Patient contact. Consultation without a Patient visit or a report by the consulting Practitioner in the medical record shall not constitute a Patient contact. (emphasis added).

> **3.4-1 REQUIREMENTS FOR ACTIVE STAFF CATEGORY**
> An Active Staff member must: (a) meet the basic qualifications of staff membership as outlined in Article II of the Bylaws and in Article II of the Credentials Manual; (b) have a least twenty-four (24) Patient Contacts ***during the preceding twenty-***

*four (24) months.* (emphasis added).

Notably, Section 2.3 of the Medical Staff Bylaws Manual (2019) also enables a waiver of the

requisite number of the contact requirement under certain circumstances.

### iii.   Flower Mound Hospital Changes Patient Contact Requirement Over Time.

81.     Flower Mound Hospital's Amended and Restated Medical Staff Bylaws

("***Bylaws***")[23] and the Company Agreement directly condition physician investment and active

medical staff status on volume and value as evidenced by the definitions and requirements of

"Patient Encounters" and "Active Attending Staff" in the Bylaws.

82.     The initial Company Agreement, implemented in January of 2008, expressly states

that in order to purchase Class P units, a "Qualified Physician Investor" must "obtain Active

medical staff privileges at the Hospital."

83.     The requirements to obtain and maintain active staff privileges are set for in the

Flower Mound Hospital Bylaws. The number of Patient Contacts (24) has always been consistent

and is an outlier in both in the Dallas Fort-Worth Community, as well as the United States. *See*

Table C, *infra*. However, between 2012 and present, Flower Mound Hospital incrementally

modified its Bylaws to redefine the requirements to qualify for and maintain active medical staff

privileges to further compel patient referrals, especially for surgeons:

> May 16, 2012 – SECTION 2 – ACTIVE STAFF. "The active staff category is
> defined by twenty-four (24) admissions *or hospital contacts** (such as *consults*
> assumption of care, major diagnostic tests and/or invasive procedures, *or other*
> contacts which may be determined and approved by the Medical Executive
> Committee as needed) per Appointment Year and shall consist of practitioners
> who are located (primary or satellite office and temporary and permanent
> residence) within a reasonable distance but no greater physical response time
> of sixty (60) minutes to the Hospital in order to provide continuous care to their

---

[23] The bylaws for Flower Mound Hospital are collectively referred to as the Bylaws, regardless
of year implemented.

patients."

84.     The next year, on April 17, 2013 the Flower Mound Hospital added to the definition to implement a requirement that those physicians who do not meet the requirement be moved to a separate category of treating physician:

> SECTION 2 – ACTIVE STAFF. "The active staff category is defined by twenty-four (24) admissions *or hospital contacts** (such as *consults* assumption of care, major diagnostic tests and/or invasive procedures, *or other* contacts which may be determined and approved by the Medical Executive Committee as needed) per Appointment Year and shall consist of practitioners who are located (primary or satellite office and temporary and permanent residence) within a reasonable distance but no greater physical response time of sixty (60) minutes to the Hospital in order to provide continuous care to their patients. Any active member of the Medical Staff who fails to meet the twenty-four (24) admission/hospital contact per Appointment Year requirement shall be moved to the courtesy staff category upon the determination by the Hospital that the member failed to meet the admission/hospital contact requirement for an Appointment Year in accordance with the process set forth in Article VIII, Section 11.H."

85.     Since Turner became President of Flower Mound Hospital, it began to focus on the "volume" cases and the expectation of physician referrals. For example, in an April 21, 2017 (10:16 AM) email, from Toni M. Bradfield On Behalf of Spencer W. Turner to Physician Partners, Subject: Announcement of Q1, 2017 Distribution, FMHP LLC, Turner states:

> Distribution
>
> The Board of Managers has approved the 2017, Q1 distribution for the months of January – March, 2017. The total distribution is $8,300,000 or $247 per share (this applies to the recent 1:3 split).
>
> Q1 finished good but a little off of budget. Volumes are good but our margin is a little off from last year mainly due to a small year over year drop in our bigger inpatient surgical cases. I will have a full report out next week.

86.     Again, even in the *THPHFM Physician Partner Newsletter*, Vol. 6 (May 2017), Turner indicates that, "[f]irst quarter saw good growth year over year in most areas but we are seeing some lag in some of our higher margin surgical procedures. This is something that is being

seen across THR so it is not unique to us. This scenario can be seen below where surgical volume is ahead of last year but earnings are flat to last year."

87.     Then, on November 17, 2017, Flower Mound Hospital revised its Bylaws to require a specific number of "patient encounters," which required "scope of the core privileges/procedures requested." In other words, for a surgeon, maintaining active staff privileges means maintaining twenty-four surgical procedures per year.

> Proposed Amendments to Bylaws Letter. <u>ACTIVE-ATTENDING STAFF CATEGORY (BYLAWS: PGS. 29-30).</u> The Active-Attending Staff category shall consist of practitioners who engage in at least twenty-four *(24) patient encounters* (a patient encounter is defined as an inpatient admission, consultation and/or documented inpatient or outpatient procedure <u>reflective of the scope of core privileges/procedures requested</u>) per Assessment Cycle [1 year] *in which the practitioner was the primary admitting and/or attending physician* and/or primary proceduralist, <u>except as expressly waived by the Medical Executive Committee and Governing Body for practitioners whose practicing specialty regularly requires consultative support</u>." (emphasis in original).

88.     Less than a year later, on September 20, 2018, Flower Mound Hospital's Board of Managers emphasized in its Bylaws  the definition of "patient encounter":

> *Bylaws*, Article V, Section 2 – ACTIVE-ATTENDING STAFF. "The Active-Attending Staff category shall consist of practitioners who engage in at least *twenty-four (24) patient encounters* (a patient encounter is defined as an inpatient admission, consultation and/or documented inpatient or outpatient procedure reflective of the *scope of core privileges/procedures requested*) per Assessment Cycle [1 year] *in which the practitioner was the primary admitting and/or attending physician* and/or primary proceduralist, except as expressly waived by the Medical Executive Committee and Governing Body for practitioners whose practicing specialty regularly requires consultative support."

89.     In other words, to be a Class P unit holder in Flower Mound Hospital, a physician must maintain active staff status. However, to maintain active status, each physician owner must annually refer a high number of cases to Flower Mound Hospital.  The change in the Flower Mound Hospital Bylaws reflects the Defendants' intent to further increase the volume and value of cases

performed by the hospital through the consistent narrowing of the active staff category definition and requirements to focus on "documented inpatient or outpatient procedure reflective of the *scope of core privileges/procedures requested*)."

90.     Flower Mound Hospital consistently enforced its Patient Contact requirement for its physician owners, sending out "Biannual Patient Encounters Activity Notifications" to Dr. Jennings, which specifically stated in each notice:

> "[a]s a reminder, failure to remain a member of the Hospital's Active medical staff is an adverse event triggering the Hospital's right to purchase your membership interest at a purchase price equal to the *lesser* of the fair market value or your capital contribution, less any distributions received from the Hospital, but not less than $100.00 per Unit." (emphasis in original)

The notices would also advise each physician investor how many qualifying Patient Contacts the physician had to date, and the date by which they were required to reach the twenty-four-contact requirement.

**(2)  Flower Mound Hospital Implements a Mandatory Buyback and Redistribution Plan to Attract and Keep to Physicians with a High Volume of Referrals.**

91.     In the spring of 2019, Flower Mound Hospital proposed amending the Flower Mound Hospital Medical Staff Bylaws to require that physicians 63 years of age or older relinquish their shares over a five-year period. In approximately April 2019, a member of the Flower Mound Hospital board of directors told Dr. Jennings that the proposed amendment was made to allow Flower Mound Hospital to use the repurchased shares to attract younger, high-volume physicians (mostly surgeons) without having to issue new share classes, so as not to diminish the existing share values.

92.     On May 17, 2019, Turner on behalf of Flower Mound Hospital, circulated a ballot vote to amend the Flower Mound Hospital Company Agreement. Many members of the medical staff never even received the initial ballot. The ballot was accompanied by a letter from the Flower

Mound Hospital's Board of Managers. The letter stated that the reason for amendment was that: "The Board of Managers has determined that, in the best interest of the Company [Flower Mound Hospital], the company agreement should be amended. *We are seeing significant issues in other partnered hospitals with participation and retirement issues which are resulting in decreased value and distributions.*" (emphasis added). There was thus a direct connection between the value each physician contributed to the hospital, and their respective ownership interest.

93.     Certain high-volume active medical staff members at Flower Mound Hospital voted for the proposed amendment. Dr. Jennings voted against it. The vote, however, required 67% approval and it allegedly passed, which was no surprise since THR owns 53.67% of the voting class interests. As a result, Flower Mound Hospital claimed that Dr. Jennings and other physicians over the age of 63 years old were forced to sell their shares. As stated above, based upon statements members of the Flower Mound Hospital board of directors made to Dr. Jennings, upon information and belief, the shares that Flower Mound Hospital "repurchased" from Dr. Jennings and others, have been or will be redistributed to physicians who will refer a high volume of patients to Flower Mound Hospital.

94.     This change to the Company Agreement, and the corresponding repurchasing of aging physicians' shares, also operated to emphasize and maximize the volume and value of cases performed at the hospital.

### (3) Flower Mound Hospital Implements a Fraudulent Billing and Claims Submission Scheme

95.     Flower Mound Hospital also knowingly violated both the AKS and Stark Law by implementing and maintaining a scheme which submitted fraudulent payment requests to Federal Programs and retaining the millions of dollars in payments received.

### i.     Required Representations for Medicare and Medicaid Services.

96.    Physicians, hospitals, pharmacies and other health care providers and facilities ("***Providers***") make a multitude of representations that they do not violate and will abide by federal laws such as Stark Law and ASK in order to receive payment from Federal Programs. Specifically, for Medicare, Providers enter into agreements with the Center for Medicare and Medicaid Services ("***CMS***") ("***Provider Agreements***") to allow them to get reimbursed from the Medicare Program. Those Provider Agreements mandate the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that ***payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law)***, and on the [provider's] compliance with all applicable conditions of participation in Medicare.

97.    Upon approval the healthcare provider or hospital receives a Medicare provider number that is cross-referenced with their tax ID number. Each provider also has a National Provider Identifier ("***NPI***").

98.    Providers also make specific representations for each claim submission. For instance, when submitting a bill under any of the federal health care programs, the healthcare provider must use codes (e.g., ICD-10, CPT) to identify the services, diagnoses and/or procedures rendered, who rendered the procedures, where the services were rendered, who is to be reimbursed and how much the government is charged. Physicians enter these codes on Form CMS-1500.[24] To

---

[24] Hospitals use Form CMS-1450, also referred to as UB-04. These forms are submitted to most third-party payors of healthcare services, including Medicare, Medicaid, TRICARE, CHAMPVA and The Federal Employee Health Benefits Program. The forms are typically submitted electronically. The codes entered on the forms determine who receives payment and how much, among others, Medicare, Medicaid, TRICARE, CHAMPVA and/or The Federal Employee Health Benefits Program, will pay for the service (s) or the good(s) provided.

qualify to receive federal funds to pay a claim, Form CMS-1500 requires a Provider certify as

follows:

   a.  the information on this form is true, accurate and complete;

   b.  I have familiarized myself with all applicable laws, regulations and program
       instructions, which are available from the Medicare contractor;

   c.  I have provided or will provide sufficient information required to allow the
       government to make an informed eligibility and payment decision;

   d.  this claim, whether submitted by me or on my behalf by my designated billing
       company, complies with all applicable Medicare and/or Medicaid laws,
       regulations, and program instructions for payment including but not limited to
       the Federal anti-kickback statute and Physician Self-Referral law (commonly
       known as Stark law);

   e.  the services on this form were medically necessary and personally furnished by
       me or were furnished incident to my professional service by my employee under
       my direct supervision, except as otherwise permitted by Medicare or
       TRICARE; and

   f.  for each service rendered incident to my professional service, the identity (legal
       name and NPI, license #, or SSN) of the primary individual rendering each
       service is reported in the designated section.

Additionally, for services to be considered "incident to" a physician's professional services, CMS-

1500 requires the services of non-physicians must be included on the physician's bills and the

services must: (a) be rendered under the physician's direct supervision by his/her employee, (b) be

an integral, although incidental part of a covered physician service, and (c) be of kinds commonly

furnished in physician's offices.[25]

   99.    The claim certification requirements include acknowledging compliance with the

---

[25] CMS Form UB-04 for hospitals has similar requirements related to its certification, requiring
the submitting person to represent the following: "THE SUBMITTER OF THIS FORM
UNDERSTANDS THAT MISPRESENTATION OR FALISFICATION OF ESSENTIAL
INFORMATION AS REQUESTED BY THIS FORM MAY SERVE AS THE BASIS FOR CIVIL
MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION
INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE
LAW(S)."

AKS and Stark Law, having the requisite physician certifications, and attesting that there was no actual knowledge, reckless misrepresentation or concealment of fraudulent claims. As stated in paragraphs 74-91 above, Flower Mound Hospital knowingly violated AKS and Stark Law when it conditioned the physicians' ownership and retention of Class P units.

### ii.   Revenues and Specific Examples of Fraudulent Billing Scheme

100.   Flower Mound Hospital receives Medicare payments and as such makes the representations regarding Stark Law and AKS described above. In doing so, for each claim submitted, it violated Stark Law and AKS. The implications for this cannot be understated, because each payment Flower Mound Hospital received from Medicare is a false claim under the False Claims Act.

101.   According to the American Hospital Directory, Flower Mound Hospital's total patient revenue, which was last updated on July 16, 2019, is $459,599,404.[26] The number of Medicare inpatients totaled 1,796 with orthopedic surgery (417), orthopedics (61), surgery (163) and urology (150) accounting for 791. The total case mix index is 1.6536, while orthopedic surgery equates to 2.8431 and surgery equates to 2.4578. Therefore, Medicare pays Flower Mound Hospital approximately $28,464,837 annually for orthopedic surgery alone. These total revenues do not reflect the total payer mix index – only Medicare. Each submission for payment for the revenues above is a fraudulent submission which violated AKS and Stark Law when submitted.

102.   Physician investors in Flower Mound Hospital performed specific surgical procedures on Medicare beneficiaries. *See,* Table D. It is believed that some of the physicians listed in Table D voted in favor of modifying the definition of Patient Contact between 2012 and present, as well as voted to redeem shares from physicians above the age of sixty-three. (*See* Table

D).

| | | |
|---|---|---|
| Patient A (10/19) | Stephen Richard Tolhurst, MD | xxxxx |
| Patient B (10/19) | Stephen Richard Tolhurst, MD | xxxxx |
| Patient C (9/19) | Chad Treece, MD | xxxxx |
| Patient D (10/19) | Chad Treece, MD | xxxxx |
| Patient E (9/19) | Patrick Shovlin, MD | xxxxx |
| Patient F (9/19) | Chad Treece, MD | xxxxx |
| Patient H (9/19) | John McElroy, MD | Xxxxx |

103.    While these Medicare patients reflect a sample of clinical procedures that were done by these high-volume physician shareholders at Flower Mound Hospital, the amount of annual revenue derived from the total referrals equates to millions of dollars. As a result, the Defendants knowingly engaged in the underlying Stark and AKS violations, which form the basis of the materially false claims being submitted on CMS Form UB-04 and CMS Form 1500. In turn, the Defendants knowingly retained the payments.[27]

**B.      Defendants Know the "Patient Contacts" Requirement is Illegal and Retaliate Against Dr. Jennings in Violation of Section 3730(h).**

104.    Dr. Jennings became increasingly uncomfortable with Flower Mound Hospital's

---

[27] Based on Dr. Jennings knowledge of how physician joint venture hospitals are owned, operated and managed, the fraudulent claims submitted by Flower Mound Hospital are systemic in the physician owned THR Physician Joint Venture Hospitals (Mar. 31, 2019). Revenue from the THR system ranges in the billions. In the first nine months of 2018, THR reported operating revenue of $3.5 billion, up 2.2 percent from $3.43 billion in the same period a year earlier. But THR's expenses also grew 2.5 percent year over year, from $3.25 billion to $3.34 billion.[27] In the first three months of 2019, THR's net income attributable to the system was $463.3 million, compared to $19.6 million during the same period in 2018. According to its financial documents, the $444.7 million increase was largely attributable to investment earnings. *See* https://emma.msrb.org/ES1272574-ES995979-.pdf

President and Board of Managers' maneuvering, which was being reflected in changes in definitions and requirements to refer a larger volume of patients to Flower Mound Hospital. He began to compare his experiences at other hospitals where he has privileges, such as Baylor Scott & White Carrollton, to the circumstances at Flower Mound Hospital and other THR hospitals.

105.    Dr. Jennings voiced concerns during various conversations and text messages with Turner, as well as other high-volume physicians who were contriving ways to keep the share price high, while guaranteeing a steady stream of cases over the years to come.

106.    The changes to the Flower Mound Hospital Bylaws became increasing concerning. The retaliation against Dr. Jennings, however, hit its pinnacle after the May 2019 vote, which led to Turner signing Dr. Jennings name in order to obtain 20% of his shares and reallocate them to younger, higher volume physicians. These actions were the "straw that broke the camel's back." In order to prevent the ongoing alleged illegal Stark Law and AKS activity from continuing, which harms the Government Programs and other physicians, Dr. Jennings obtained counsel and filed this Complaint.

107.    On June 24, 2019, Dr. Jennings received a letter confirming that 46.284 of his Class P Membership Units were redeemed, along with a check for $189,764.40, which was deemed to be based on fair market value, according to Flower Mound Hospital.

## VIII. CAUSES OF ACTION

### COUNT I
### (False Claims Act, 31 U.S.C. § 3729(a)(1)(A) – (B))

108.    Relator and Plaintiff repeat and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

109.    Defendants engaged in interstate commerce when the invoices, which are material, were submitted to the United States Government through either the United States mail and/or

Page 37

electronic submission via the internet.

110.    Through the acts and inaction alleged above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States Government for payment or approval, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

111.    Through the acts and inaction alleged above, Defendants knowingly made, used, or caused to be made or used, false or fraudulent records and statements material to false or fraudulent claims, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

112.    Defendants violated the federal False Claims Act by submitting, or causing to be submitted, claims for reimbursement from federal health care programs, including Medicare and Medicaid, knowing that those claims were ineligible for the payments demanded.

113.    Each claim written as a result of the Defendants' illegal conduct represents a false or fraudulent record or statement.

114.    Each claim for reimbursement for illegally induced CMS Form 1500 or CMS Form UB-04 service and/or supply submitted to a federal health insurance program represents a false or fraudulent claim for payment.

115.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused.  The false claims were presented by the thousands, and over many years.

116.    The United States Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay claims that would not be paid but for Defendants' unlawful conduct.

117.    By reason of Defendants' acts, the United States has been, and may continue to be, damaged in a substantial amount to be determined at trial.

118.    Additionally, the United States is entitled to the maximum penalty for each and

every false and fraudulent claim made and caused to be made by Defendants arising from its unlawful conduct as described herein.

119.    All of the Defendants' conduct described in this Complaint was knowing, as that term is used in the federal False Claims Act, and material, as that term is defined in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

## COUNT II
### Violations of 31 U.S.C. § 3729(a)(1)(A)

120.    Relator and Plaintiff repeat and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

121.    This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

122.    During the relevant period, Defendants knowingly presented numerous claims for payment to the United States Government through the Federal Programs.

123.    For the reasons alleged herein, many of these claims were knowingly false and fraudulent within the meaning of the False Claims Act.  More specifically, Defendants knowingly presented, and caused to be presented, to an officer and/or employee of the United States Government false and fraudulent claims for payment and approval in violation of 31 U.S.C. § 3729(a)(1)(A).

124.    Defendants had actual knowledge of the falsity of these claims, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the False Claims Act.

125.    The United States Government suffered damages as a result of false claims by Defendants and is entitled to recover its losses and otherwise obtain relief available under the False Claims Act.

## COUNT III

**Violations of 31 U.S.C. § 3729(a)(1)(B)**

126.    Relator and Plaintiff repeat and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

127.    This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729 et seq., as amended.

128.    Defendants have presented tens of thousands of false records and statements to the United States Government through a variety of government programs, including but not limited to Medicare, Medicaid and TRICARE.

129.    For the reasons alleged herein, many of these records and statements were knowingly false and fraudulent within the meaning of the False Claims Act. More specifically, Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent incentive payments/grants, as well as claims paid and approved, by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(B).

130.    Defendants had actual knowledge of the falsity of these statements, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the False Claims Act.

131.    The United States Government suffered damages as a result of false records and statements by Defendants and is entitled to recover its losses and otherwise obtain relief available under the False Claims Act.

**COUNT IV**
**(False Claims Act, 31 U.S.C. § 3729(a) (1) (2006))**
**(False Claims Act, 31 U.S.C. § 3729(a)(1)(G) (West 2013))**
**Knowing Retention of Overpayments**

132.    Relator and Plaintiff repeat and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

133.    This is a claim for penalties and treble damages under the False Claims Act, 31

U.S.C. § 3729 *et seq*., as amended.

134.    During the relevant period, Defendants presented numerous claims for payment to the United States Government through Medicare, Medicaid and TRICARE, as well as other payors; and, knowingly retained the overpayments in violation of 31 U.S.C. § 3729(a)(1)(G) when Defendants failed to repay the money within 60 days.

135.    For the reasons alleged herein, many of these claims were knowingly false and fraudulent within the meaning of the False Claims Act. More specifically, Defendants knowingly withheld, and caused to be withheld, to an officer and/or employee of the United States Government false and fraudulent claims for which payment and approval had been received in violation of 31 U.S.C. § 3729(a)(1)(G) when Defendants failed to repay the money within 60 days.

136.    Defendants had actual knowledge of the falsity of these claims, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the False Claims Act.

137.    The United States suffered damages as a result of the reverse false claims that were knowingly retained by the Defendants and is entitled to recover its losses and otherwise obtain relief available under the False Claims Act.

## COUNT V
### (Conspiracy in Violation of the False Claims Act - 31 U.S.C. § 3729(a)(1)(C))

138.    Relator and Plaintiff repeat and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

139.    This is a claim for treble damages and penalties under the False Claims Act, 31 USC § 3729, *et seq*., as amended.

140.    Through the acts and inaction alleged above, Defendants, acting together in concert as each other's contractors, agents, partners, and/or representatives in making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to

the United States, or in concealing, avoiding or decreasing an obligation to pay or transmit money to the United States, were acting within the course, scope and authority of such contract, agency, partnership and/or representation for the conduct described herein and conspired to engage in actions and inactions in violation of the False Claims Act.

141.   By reason of Defendants' acts, the United States Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

142.   Additionally, the United States is entitled to the maximum penalty for each and every false record or statement made through Defendants' conspiracy to defraud the United States.

## COUNT VI
### (60-day Rule, Affordable Care Act, Section 6402(a); 42 CFR § 401.305 Concealing or Avoiding Obligation to Pay)

143.   Relator and Plaintiff repeat and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

144.   This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

145.   During the relevant period, Defendant presented numerous claims for payment to the United States Government through Government Programs, as well as other payors.

146.   For the reasons alleged herein, many of these claims were knowingly false and fraudulent within the meaning of the False Claims Act. More specifically, Defendant knowingly withheld, and caused to be withheld, to an officer and/or employee of the United States Government false and fraudulent claims for which payment and approval had been received in violation of Affordable Care Act, Section 6402(a); 42 CFR § 401.305, when Defendant failed to repay the money within 60 days. Defendant had actual knowledge of the falsity of these claims, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the False

Claims Act.

147.    The United States suffered damages as a result of false claims by the Defendant and is entitled to recover its losses and otherwise obtain relief available under the False Claims Act.

### COUNT VII
### (Retaliation of the Relator in Violation of the
### False Claims Act –31 U.S.C. § 3730(h))

148.    Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if set forth fully herein.

149.    Defendants violated the False Claims Act, 31 U.S.C. § 3730(h), by reducing Dr. Jenning's ownership interest and precluding him from participating in various meetings and activities due to his refusal to participate in and perpetuate Defendants' schemes and unlawful acts to submit or cause to be submitted, claims to the federal health care programs that were paid by the United States Government in violation of the False Claims Act.

150.    In response, Defendants singled out Dr. Jennings for criticism and disciplinary action, harassed him and ultimately had Turner sign his name as "Attorney in Fact" for Dr. Jennings share redemption, despite knowing that he, Turner, had an inherent conflict of interest.

151.    Defendants wrongfully retaliated against Dr. Jennings for investigating and reporting the non-compliance with the Stark and Anti-kickback laws, knowing that such violations and claims for payment from the United States Government would result in false and fraudulent claims under the False Claims Act.

152.    As a direct and proximate result of Defendants' conduct, Dr. Jennings has suffered damages in a substantial amount to be determined at trial.

## COUNT VIII
## Unjust Enrichment

153.    Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

154.    Defendants were unjustly enriched by engaging in unlawful acts and knowingly and intentionally submitting false claims, and are liable to account and pay such amounts, which are to be determined at trial, to the United States Government.

## VIII. <u>DAMAGES AND PENALTIES</u>

155.    Plaintiff and Relator repeat and re-allege each allegation in each of the preceding paragraphs as if fully set forth herein.

156.    Plaintiff and Relator seek all actual damages caused by Defendants violations of the federal False Claims Act in an amount to be proved at trial and ask that those damages be trebled as required by the statute.

157.    Plaintiff and Relator seek the penalties as provided for by the federal False Claims Act up to the maximum amount allowed by law for each of Defendants' violations of the False Claims Act.

158.    Plaintiff and Relator seek all equitable relief to which they are entitled, in an amount to be proved at trial, due to Defendants' unlawful conduct that constitutes unjust enrichment.

159.    Relator seeks all actual damages in an amount to be proved at trial caused by his unlawful termination under the federal False Claims Act.

160.    Plaintiff and Relator seek all costs of this action, including attorneys' fees and expenses.

## IX. **PRAYER FOR RELIEF**

**WHEREFORE**, Relator/Plaintiff prays for judgment as follows:

A.      That Defendants each be ordered to cease and desist from violating 31 U.S.C. §3729 *et seq*.;

B.      That this Court enter judgment against Defendants in an amount equal to treble (three times) the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of 31 U.S.C. § 3729 prior to November 2, 2015;

C.      That this Court enter judgment against Defendants in an amount equal to treble (three times) the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of not less than $10,781.00 and not more than $21,563.00 for each violation of 31 U.S.C. § 3729 after November 2, 2015, pursuant to 81 Fed. Reg. 42491, 42494 (Jun. 30, 2016);

D.      That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the federal False Claims Act;

E.      That this Court enter judgment against Defendants and in favor of Relator for Defendants' violation of §3730(h) of the federal False Claims Act and that Relator be awarded the maximum amount allowed pursuant to §3730(h) of the federal False Claims Act;

F.      That this Court enter judgment against Defendants for all equitable relief to which Plaintiff and Relator are entitled due to Defendants' conduct that constitutes unjust enrichment;

G.      That this Court enter judgment against Defendants ordering Defendants to pay Relator, his attorney, the United States Government and its attorneys all costs of this action, including attorney's fees and expenses; and

H.      For such other and further relief as this Court may deem proper.

## X.  JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Relator demands a jury trial for all claims and issues so triable.

Dated: November 8, 2019

Respectfully Submitted,

RACHEL V. ROSE – ATTORNEY AT LAW, PLLC

By: */s/ Rachel Veronica Rose*
**Rachel Veronica Rose**
Texas State Bar No. 24074982
rvrose@rvrose.com
P.O. Box 22718
Houston, Texas  77227
Telephone: (713) 907-7442

CRAWFORD, WISHNEW & LANG, PLLC

*/s/ David F. Wishnew*
**Michael J. Lang**
Texas Bar No. 24036944
mlang@cwl.law
**David F. Wishnew**
Texas State Bar No. 24052039
dwishnew@cwl.law
**Mark T. J. Jones**
State Bar No. 24097900
tjjones@cwl.law
1700 Pacific Avenue, Suite 2390
Dallas, Texas  75201
Telephone: (214) 817-4500
Facsimile: (214) 817-4509

JS 44 (Rev. 06/17) - TXND(Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States of America ex rel. Leslie D. Jennings, MD

**DEFENDANTS**
Flower Mound Hospital Partners, LLC d/b/a Texas Presbyterian Hospital Flower Mound, and Texas Health Resources

**(b)** County of Residence of First Listed Plaintiff   Dallas
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Denton
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See attached.

Attorneys *(If Known)*

NOV 8 2019

NORTHERN DISTRICT OF TEXAS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)*   and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☒ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. § 3729 et seq

Brief description of cause:
Qui Tam

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE      DOCKET NUMBER

DATE
11/08/2019

SIGNATURE OF ATTORNEY OF RECORD
/s/ Dave Wishnew (with permission)    /s/ Rachel V. Rose (with permission)

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If a related case exists, whether pending or closed, insert the docket numbers and the corresponding judge names for such cases. A case is related to this filing if the case: 1) involves some or all of the same parties and is based on the same or similar claim; 2) involves the same property, transaction, or event; 3) involves substantially similar issues of law and fact; and/or 4) involves the same estate in a bankruptcy appeal.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# *Civil Cover Sheet Supplement*

I.        **(c)** Attorneys (*Firm Name, Address, and Telephone Number*)

Rachel Veronica Rose
Rachel V. Rose - Attorney at Law, PLLC
P.O. Box 22718
Houston, Texas 77227
Telephone: (713) 907-7442

Michael J. Lang
David F. Wishnew
Mark "T.J." Jones
Crawford, Wishnew & Lang PLLC
1700 Pacific Avenue, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500